UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
------------------------------------------------------------
In re:

NOBLEHOUSE TECHNOLOGIES, INC.,

                        Chapter 11
                        Case No.: 12-10797

                  Debtor(s).
------------------------------------------------------------
WESTCON GROUP NORTH AMERICA, INC.,

                  Plaintiff(s),
    v.                                    Adv. No.: 12-90045

RBS CITIZENS, N.A.,
                  Defendant(s).
------------------------------------------------------------

APPEARANCES:

Polsinelli, P.C.                                      Jason A. Nagi, Esq.
*Attorneys for Plaintiff*                     David D. Ferguson, Esq.
805 Third Avenue, Suite 2020      Christopher A. Ward, Esq.
New York, New York 10022

Nolan & Heller, LLP                      Francis J. Brennan, Esq.
Attorneys for RBS Citizens, N.A.
39 North Pearl Street
Albany, New York 12207

Hon. Robert E. Littlefield, Jr., Chief United States Bankruptcy Judge

## **MEMORANDUM-DECISION & ORDER**

      Before the court is an adversary proceeding commenced with the filing of a complaint on June 26, 2012, by Westcon Group North America, Inc. ("Westcon"), seeking equitable subordination of the secured claim held by RBS Citizen, N.A. ("Citizens") pursuant to 11 U.S.C. § 510(c). On May 8, 2013, Citizens and Westcon each filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a), incorporated into the Federal Rules of Bankruptcy Procedure by Rule 7056, and both filed opposition to the competing motions. At the conclusion of oral argument on May 29, 2013, the court gave the parties until June 28, 2013, to

1

submit additional memoranda of law. The matter was then taken on submission. After considering the pleadings and the evidence and arguments offered, the court finds that summary judgment should be awarded to Citizens.

## Statement of Facts

The court has jurisdiction over this core matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a), 157(b)(1) and (2).

The material facts are not in dispute. NobleHouse Technologies, Inc. ("NobleHouse" or "Debtor") is a supplier and installer of telecommunications equipment through its subsidiaries, CNC Microtech, Inc. and Control Network, Inc. Citizens is the Debtor's only secured creditor. Citizens and CNC Communications, Inc., predecessor of the Debtor, and Control Network entered into a loan agreement, dated December 28, 2005, with respect to a revolving credit facility and a term loan (the "Loan Agreement"). The original principal amount of the Debtor's indebtedness to Citizens was $4,000,000. During the ensuing years, the Loan Agreement was modified, amended or supplemented approximately eight times (collectively, the "Loan Documents"). As collateral for the loan, Citizens was granted a first priority security interest against all of the assets of the NobleHouse Companies.[1]

The Debtor encountered financial difficulties in, or about, early 2011 and, subsequently, defaulted on its obligations to Citizens. Citizens lost confidence in the Debtor's management. As a result, Citizens installed a wind-down consultant at the Debtor and began taking steps to enforce its rights, including repossession and liquidation of its collateral. In an effort to avoid having its business shut down, the Debtor reached out to Integra Networks ("Integra"). Integra is a manufacturer of telecommunications products that had previously done business with CNC

---

[1] For purposes of this decision the NobleHouse Companies consist of the Debtor, CNC Microtech, and Control Network, Inc.

2

Microteh and Control Network. The Debtor's then president, David Wood, arranged a meeting with David Prescott and Paul Ryan, the owners of Intergra. Following the meeting, Integra hired an accounting firm to evaluate the finances of the NobleHouse Companies. The accounting firm hired Harold Armstrong to conduct the due diligence and report back to Integra. Satisfied with the report, Integra, acting through its subsidiary, Cable Acquisition Company, LLC ("CAC"), agreed to acquire Citizens' loan. On April 14, 2011, Citizens assigned its right, title and interest in its loan to CAC pursuant to an Assignment and Acceptance Agreement, dated April 14, 2011, by and among Citizens, as assignor, CAC, as assignee, and the Noble House Companies. The assignment was subject to a Pledge and Security Agreement whereby Citizens retained a security interest in the Loan Documents in the event of a default by CAC in the payment of the consideration for the assignment. By virtue of the assignment, CAC became the holder of a lien against all assets of the NobleHouse Companies. After this assignment, CAC, like Citizens before it, required changes in management at NobleHouse Companies. At CAC's direction, Paul Ryan, a part owner of Integra, was named the Debtor's CEO, and Harold Armstrong was named its CFO.

Shortly before CAC acquired the Citizens' loan, CNC entered into a certain lock box agreement with Westcon, one of its suppliers. Westcon's relationship with CNC began in November 2008. At that time, CNC applied to purchase products from Westcon on credit. Due to CNC's financial instability, CNC obtained extensions of credit from Westcon for product designated for specific customers under lock box agreements. According to Westcon, the lock box arrangement provided a more efficient and faster collection mechanism between it and the Debtor. Westcon was never advised by any of the Noble House Companies or CAC of the assignment of the Citizens' loan to CAC.

The lock box agreement at issue was executed on March 29, 2011, by David B. Wood, on behalf of CNC, Westcon, and HSBC. Pursuant to its terms, CNC assigned to Westcon all payment rights arising out of the sale of products and services to Kaleida Health ("Kaleida"), CNC's customer. (ECF No. 35, Ex. 32 (the "Kaleida Lock Box Agreement")). The Kaleida Lock Box Agreement was executed approximately two weeks before new management was put in place at CNC by CAC in connection with the assignment of Citizens' loan to CAC. The lock box referenced in the Kaleida Lock Box Agreement was to be controlled by HSBC. Under the Kaleida Lock Box Agreement, HSBC would deposit all checks received via the lock box into an account owned by Westcon. Pursuant to the Kaleida Lock Box Agreement, CNC's invoice was to instruct Kaleida to remit CNC's payment directly to the HSBC lock box account controlled by Westcon. CNC and HSBC acknowledge in the Kaleida Lock Box Agreement that Westcon holds a security interest in all funds deposited into the lock box. The lock box payment arrangement was communicated to Kaleida by an employee of the Debtor, Kevin Farrell, on notice to Westcon. A subsequent invoice sent to Kaleida by Mr. Farrell in connection with the product purchased from Westcon, however, contained the Debtor's remittance address, rather than the lock box address.

Sometime in May 2011, after new management was in place, CNC received payment directly from Kaleida despite the Kaleida Lock Box Agreement. It is undisputed that the direct payment to CNC was an innocent mistake on Kaleida's part and not the result of any wrongdoing by Kaleida. While Kaleida had previously been directed to remit payment to the lock box, it was unaware of the Kaleida Lock Box Agreement and the relationship between the Debtor, Westcon and HSBC set forth therein. On May 31, 2011, the balance in CNC's bank account was approximately $499,755, which included payment from Kaleida. After receiving payment from

Kaleida, CNC acknowledged that it confirmed that there were no UCC filings evidencing a security interest in the Kaleida account receivable or payment in favor of Westcon. CNC did not advise Westcon that it had received payment directly from Kaleida, and CNC's answers to Westcon's questions about the status of the Kaleida payment were evasive. In June 2011, CNC's CEO, Paul Ryan, and CFO, Harold Armstrong, directed that the Kaleida funds be used to pay various debts of CNC, including monies to CAC and Integra. The balance of the funds was used to maintain the Debtor's operations.

The Debtor attempted to negotiate a payment plan with Westcon and paid some, but not all, amounts due on the Kaleida account. On December 7, 2011, Westcon commenced an action in state court against NobleHouse, CNC, and CNC Communications, Inc., to collect amounts due for product sold in connection with CNC's Kaleida account as well as other accounts. The action was based on breach of contract and breach of guaranty.

On March 28, 2012, Debtor filed for relief pursuant to Chapter 11 of the Bankruptcy Code. Eight days prior to the filing, the Debtor assigned CNC's existing assets and liabilities to itself. Meanwhile, the Debtor, CNC, and CNC Communications, Inc. never responded to Westcon's state court summons and complaint. As a result, Westcon obtained a default judgment against CNC on May 29, 2012 for $467,896.61. Due to the prepetition assignment of CNC's assets and liabilities to NobleHouse and the subsequent bankruptcy filing, Westcon's judgment was pulled into the bankruptcy estate of NobleHouse. Following a default by CAC in payments due to Citizens under the Assignment, Citizens conducted a sale of the collateral (the Loan Documents) on July 17, 2012. Citizens is the holder of the Loan Documents pursuant to that sale and Debtor's sole secured creditor. Citizens file a secured proof of claim in the amount of $3,176,678.72. (Case No. 12-10797, Claim No. 4.)

## Arguments

Citizens argues that the Debtor's actions cannot be attributed to CAC and, therefore, Westcon's claim for equitable subordination must be denied. Citizens also asserts that even if the Debtor's actions could be imputed to CAC, Westcon did not suffer the requisite "particularized injury" needed by a creditor to establish a claim for equitable subordination. Citizens states that Westcon's claim is not different from other general unsecured creditors' claims in that it merely holds a breach of contract claim for nonpayment which, in this case, has been reduced to judgment by a state court.

Westcon argues that CAC, acting through newly appointed executives of the Debtor, Paul Ryan and Harold Armstrong, used its control over the Debtor to the detriment of Westcon. More specifically, Westcon contends that CAC was responsible for Westcon not receiving the Kaleida payment as provided for under the Kaleida Lock Box Agreement and the subsequent improper distribution of the funds received from Kaleida. Westcon asserts that Citizens is liable for CAC's prior conduct with respect to the Debtor as a result of it repossessing the Loan Documents from CAC. Westcon also asserts that it suffered a particularized injury because it possessed something more than a promise of payment from the Debtor. According to Westcon, under the Kaleida Lock Box Agreement, CNC assigned it the right to payment directly from Kaleida and, but for the actions of the insiders installed by CAC, it would have received that payment. Thus, Westcon contends that the Kaleida Lock Box Agreement gives it an enhanced creditor position that separates it from other general unsecured creditors.

## Discussion

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

6

and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2); FED. R. BANKR. P. 7056. It is the movant's burden to show that no genuine factual dispute exists. *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (citation omitted). In reviewing a summary judgment motion, the court must resolve all ambiguities and draw all reasonable inferences in the non-movant's favor. *Id.* If the moving party meets its initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts asserted by the movant. FED. R. CIV. P. 56(e)(2); FED. R. BANKR. P. 7056. Mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York (In re Kulak)*, 88 F.3d 63, 71 (2d Cir. 1996) (citations omitted).

***Equitable Subordination***

Pursuant to § 510(c), all or a portion of a claim may be subordinated to other claims under a theory of equitable subordination. More specifically, "the court may . . . under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim . . . ." 11 U.S.C. § 510(c). Equitable subordination affects the order of distribution to creditors. Its aim is to undo a wrongdoing by one creditor in the interest of the other creditors. *In re Applied Theory Corp.*, 345 B.R. 56, 59 (S.D.N.Y. 2006), *aff'd*, 493 F.3d 82, 87 (2d Cir. 2007) (citing *In re Lockwood*, 14 B.R. 374, 380-81 (Bankr. E.D.N.Y. 1981)). Equitable subordination is an "unusual remedy" to be used only in "limited circumstances." *In re Bolin & Co.*, 437 B.R. 731, 761 (D. Conn. 2010) (citing *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators, Inc.)*, 926 F.2d 1458, 1464 (5th Cir. 1991)). It is "remedial, not penal, and should be applied only to the extent necessary to offset the specific

7

harm that the creditor suffered on account of the inequitable conduct." *In re Fabricators, Inc.*, 926 F.2d at 1464 (quoting *Trone v. Smith (In re Westgate-California Corp.)*, 642 F.2d 1174, 1178 (9th Cir. 1981)).

The parties agree that Citizens did not engage in inequitable conduct. The transfer of CAC's claim to Citizens, however, was subject to all defenses and liabilities, including, equitable subordination. *In re Enron Corp.*, 33 B.R. 205, 2010 (Bankr. S.D.N.Y. 2005) ("[T]he transfer of a claim subject to equitable subordination does not free such claim from subordination in the hands of the transferee.")

The initial burden of showing that grounds exist for equitable subordination of a creditor's claim is with the objecting party. *Id.* at 1465 (citing *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 701 (5th Cir. 1977)). Courts may equitably subordinate a claim when (1) the creditor in question engaged in inequitable conduct; (2) the misconduct resulted in injury to other creditors or conferred an unfair advantage on the claimant; and (3) the subordination of the creditor's claim is not inconsistent with other provisions of the Bankruptcy Code. *In re Bolin & Co.*, 437 B.R. at 760 (citing *In re Mobile Steel Co.*, 563 F.2d 692, 699-700). In most instances, the misconduct that courts have deemed sufficiently inequitable to warrant equitable subordination has fallen within one of three categories: "'(1) fraud, illegality, breach of fiduciary duties; (2) under-capitalization; [or] (3) claimant's use of the debtor as a mere instrumentality or alter ego.'" *In re Sentinel Mgmt. Group, Inc.*, Nos. 10-3787, 10-3990, 11-1123, 2013 WL 4505152, at *8 (7th Cir. Aug. 26, 2013) (quoting *In re Lifschultz*, 132 F.3d 339, 345 (7th Cir. 1997)).

**Standing**

An individual creditor may assert a claim for equitable subordination against another creditor. *In re Granite Partners, L.P.*, 210 B.R. 508, 514 (Bankr. S.D.N.Y. 1997). However, for an individual creditor to have standing to assert a claim for equitable subordination, the creditor must have suffered a "particularized injury," rather than a general harm to the estate or all creditors. *See In re Applied Theory Co.*, 493 F.3d 82, 87 (29 Cir. 2007) (citing *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 700-03 (2d Cir. 1989)); *In re Blockbuster Inc.*, Case No. 10-14997, Adv. No. 10-05524, 2011 WL1042767, at *1 (Bankr. S.D.N.Y. 2011). "[A] particularized injury is an 'injury significantly different from the injuries to creditors in general.'" *In re Blockbuster Inc.*, 2011 WL1042767, at *2 (citation omitted).

For purposes of the summary judgment motions, the court will assume that CAC was an insider of the Debtor such that the Debtor's action can be attributable to CAC. To access whether Westcon suffered a particularized injury conferring it with standing to seek equitable subordination, the court must look to the legal rights which Westcon acquired from the Debtor. The golden rule of assignments is that the assignee steps into the shoes of the assignor and so the assignee can never stand in a greater place than an assignor. *Int'l Ribbon Mills, Ltd. (Arjan Ribbons)*, 36 N.Y.2d 121, 126 (1975). Therefore, the court's analysis starts with determining what rights the assignor, in this case, the Debtor, had at the time it executed the assignment contained in the Kaleida Lock Box Agreement. For purposes of the summary judgment motions, the court will also assume there was in fact a valid assignment. It is uncontested that Westcon did not have a properly perfected security interest in the account receivable from Kaleida. Rather, Westcon was granted a security interest by the Debtor in the funds once they were deposited into the lock box controlled by HSBC. Even more crucial, looking at the transaction between the Debtor and Kaleida, the Debtor merely had the right to receive payment from

Kaleida for the products it sold. In short, there was no perfected security interest at either end of this transaction. Thus, Westcon, as the assignee, at the very most received from the Debtor the unsecured right to receive payment.

The Kaleida Lock Box agreement was not foolproof. There was a risk associated with Westcon doing business with the Debtor, with or without CAC. The way the Lock Box Agreement was structured, there was always the possibility that a disbursement mistake could be made by the customer and a payment remitted directly to the Debtor rather than the lock box. Then, once the money was in the hands of the financially strapped Debtor there would be many hands outstretched for payment. Once the Kaleida payment was in the Debtor's hands, all Westcon had was the Debtor's promise to pay the money over to it, an unsecured promise entitling Westcon to nothing more than any other general unsecured creditor. If Westcon had obtained a perfected security interest in the account receivable then, perhaps, it could have argued it held an interest in the funds paid to the Debtor by Kaleida superior to those of other creditors. Such, however, was not the case.

A financially strapped debtor exposes its creditors to greater risk. If a creditor chooses to do business with a debtor strapped for funds, it can require security, collateral, or cash on delivery. If, however, a creditor does allow a strapped customer to pay on credit and it does not pay, the creditor cannot feign surprise. The Debtor approached Integra, CAC's parent, as a means to prevent Citizens from essentially closing it down. CAC provided the Debtor with access to product as well as a credit line and the ability to stay afloat for another year. Thus, it is not beyond reason that some of the Kaleida payment made its way to CNC and Integra so that the Debtor could keep its doors open. .

***Inequitable Conduct and Injury to Creditor***

Even if the court concludes that Westcon could demonstrate a particularized injury and, assuming again for purposes of the pending motions, that CAC was an insider creditor, the court would still reach the conclusion that equitable subordination is not warranted in this case. Whether a claimant is an insider of the debtor bears on the degree of scrutiny a court will apply to the claimant's conduct. The conduct of an insider is subject to more rigorous scrutiny. *In re Fabricators, Inc.*, 926 F.2d at 1465 (citations omitted). Insider status by itself, however, is an insufficient basis for equitable subordination. *In re Phase I Molecular Toxicology, Inc.*, 287 B.R. 572, 580 (Bankr. D.N.M. 2002). To equitably subordinate an insider's claim, "'the creditor-insider must actually use its power to control to its own advantage or to the other creditor's detriment.'" *Id.* (quoting *In re Fabricators, Inc.*, 926 F.2d at 1467).

The most common type of inequitable conduct warranting equitable subordination by a corporate insider is the use of their control over a financially trouble company for personal gain to the detriment of other creditors. *Stoumbos v. Kilimnik*, 988 F.2d 949 (9th Cir. 1993). Often this involves an insider converting their equity interests into secured debt in anticipation of bankruptcy. *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1356 (7th Cir. 1990) (citations omitted). CAC did not hold an ownership interest in the Debtor. Rather, CAC, by way of assignment, was a secured lender of the Debtor.

Westcon asserts that CAC's conduct involved more than a mere breach of contract and rose to the level of tortious interference with the Kaleida Lock Box Agreement. To state a claim for tortious interference with a contract, a plaintiff must establish: "'(1) a valid contract between the plaintiff and a third-party, (2) defendant's knowledge of the contract, (3) defendant's intentional procurement of the third-party's breach of the contract without justification, (4) actual breach of the contract, and (5) damages resulting therefrom. *In re Coudert Bros., LLP*, (quoting

11

*Lama Holding Co. v. Smith Barney*, 88 N.Y.2d 413, 424, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996)). There is no evidence that Mr. Farrell, Mr. Ryan, or Mr. Armstrong directed or intentionally caused the lock box remittance address to be left off the Kaleida invoice. Nor is there any evidence that any of these gentlemen contacted Kaleida and instructed it to remit payment directly to the Debtor. Instead, the record establishes that the Kaleida Lock Box Agreement was executed prior to CAC purchasing Citizens' loan and installing new management. The record also demonstrates that once the Kaleida funds were in the hands of the Debtor, the Debtor did what it thought was necessary to stay afloat

"'The fundamental aim of equitable subordination is to 'undo or offset any inequity in the claim position of a creditor that will produce injustice or unfairness in terms of the bankruptcy result.'" *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 498 (S.D.N.Y. 1994) (quoting *Monzack v. ADB Investors (In re EMB Assocs., Inc.)*, 92 B.R. 9, 15 (Bankr. D.R.I. 1988)). Westcon had a lock box agreement that, if all went as planned, would guaranty payment by the Debtor of the product sold to Kaleida. However, there was one contingency, the money needed to hit the lock box controlled by HSBC. If that did not occur and the money went to the Debtor and the Debtor failed to turn the receivable over, as happened here, then Westcon would possess a claim based upon breach of contract. Even if CAC's use of the funds was unfair and CAC may have been less than truthful in advising Westcon as to the status of the Kaleida receivable, such behavior is not inconsistent with that of a financially strapped company. Westcon suffered no additional harm on account of any alleged actions by CAC than it would had the Debtor received the funds, nor did CAC obtain an unfair advantage. CAC held a lien against all of the Debtor's assets by reason of the assignment from Citizens, which had been properly perfected long before the Debtor received the Kaleida payment. Thus, the funds received by CNC from Kaleida were

subject to CAC's security interest, which interest was superior to Westcon's alleged interest in those funds.

## Conclusion

In accordance with the foregoing discussion, the court enters the following final order with respect to the dueling motions for summary judgment. It is hereby ORDERED that

1. RBS Citizens, N.A.'s motion for summary judgment is GRANTED and the complaint is dismissed; and

2. Westcon Group North America, Inc.'s motion for summary judgment is DENIED.

Albany, New York  
December 24, 2013

/s/ Robert E. Littlefield, Jr.  
Robert E. Littlefield, Jr.  
Chief Untied States Bankruptcy Judge